Chief Judge Fuld.
The basic question presented in these cases — one of first impression — is this: Where a nonprofit-making hospital challenges the representation status of a union, does section 716 of the New York State Labor Law empower the New York State Industrial Commissioner to appoint a fact-finding commission to make recommendations for the settlement of the dispute and, if its recommendations are rejected, to submit the issues to compulsory arbitration before the New York State Board of Mediation? The Appellate Division held that the Industrial Commissioner had such power. We disagree; the orders appealed from must be reversed.
A proper understanding of the matters in issue calls for a brief review of the legislative history of section 716 and cognate sections of the Labor Law.
Prior to July, 1963, state and local governments were greatly concerned with repeated strikes, picket lines and violence in nonprofitmaking hospitals, which interrupted essential services by hospital employees, and which resulted in the issuance of a number of injunctions against strikes. (See Jewish Hosp. of Brooklyn v. “John Doe,” 252 App. Div. 581; Society of N. Y. Hosp. v. Hanson, 185 Misc. 937, affd. 272 App. Div. 998; Beth-El Hosp. v. Robbins, 186 Misc. 506; Mount Sinai Hosp. v. Davis, 17 Misc 2d 727.) The Legislature, in considering the enactment of a remedial statute, was confronted with the provisions of the New York State Labor Relations Act which deprived unions, not recognized by a nonprofitmaking hospital, of the right to be certified *32 as the exclusive representative of the employees it represented. Further, the Legislature well knew that, although the courts had enjoined hospital employees from striking and that it was in the public interest to continue the prohibition against such strikes, it would have been unjust to deprive hospital employees of their most potent economic weapon without granting them adequate means of securing relief against substandard wages and working conditions.
In an attempt to resolve these problems, the Legislature, in 1963, amended the Labor Law. There were three vital amendments.
First, strikes by employees of nonprofitmaking hospitals or residential care centers and lockouts by the employer were made unlawful (Labor Law, § 713).
Second, the provisions of the State Labor Relations Act were extended to those institutions (Labor Law, § 715). By enabling unions of hospital employees to invoke the procedures of the State Labor Relations Board, such unions, without striking, could become certified as the exclusive representatives of such employees (Labor Law, § 705). A union of hospital employees could thus petition the board for certification as exclusive representative of an appropriate unit of hospital employees. If the hospital refused to recognize a duly certified union, the union could obtain from the board and, if necessary, from the court an order directing the hospital to bargain with the union (Labor Law, § 704, subd. 6; §§ 705, 706, 707, subd. 1). Under well-established principles, the only way in which an employer, whether industrial or a hospital, could obtain court review of the validity of a board certification was by refusing to bargain with the union and then challenging the board’s subsequent order stamping such refusal an unfair labor practice. (See Matter of Wallach’s, Inc. v. Boland, 277 N. Y. 345.)
Third, under section 716 (a new section), mediation, fact-finding and binding arbitration were established for the resolution of “ disputes ” between a nonprofitmaking hospital or residential care center and a union. The Industrial Commissioner or the New York State Board of Mediation was empowered to submit “ disputes ”, as defined by that section, to a fact-finding commission and, if the findings were rejected, *33 to binding arbitration. Section 716, far from encompassing all disputes, covered only economic and union security issues; this is the way in which section 716 (subd. 1) reads: “ As used in this section ‘ grievance ’ means any controversy or claim arising out of or relating to the interpretation, application or breach of the provisions of an existing collective bargaining contract. As used in this section ‘ dispute ’ means all other controversies, claims or disputes between the employees of a non-profitmaking hospital or residential care center, or their representatives, and such hospital or residential care center concerning wages, hours, union security, seniority or other economic matters, including, but not limited to, controversies, claims or disputes arising in the course of negotiating, fixing, maintaining, changing or arranging such terms or conditions.”
Thus, under the 1963 amendments, the Labor Board’s traditional jurisdiction to determine representation questions — subject to court review under section 707 — was for the first time extended to cover nonprofitmaking hospitals and residential care centers, and. all other disputes (primarily economic issues) were to be determined through mediation, fact-finding and compulsory arbitration. The new amendments consequently meshed into the existing system controversies between nonprofitmaking hospitals and unions, leaving representation issues to the Labor Board, subject to court review under section 707, and economic issues to mediation, fact-finding and compulsory arbitration.
With this legislative background, we turn now to the events and proceedings in these cases. The Labor Board certified Local 144 as the bargaining representative of the maintenance employees. The hospital thereafter refused to bargain collectively with it on the ground that it did not represent the employees as it claimed. The union chose not to follow the traditional procedure of filing an unfair labor practice charge under section 704 (subd. 6) against the hospital for refusal “ to bargain collectively with representatives of employees ” — a procedure which, as we have already pointed out, would have enabled the hospital judicially to challenge the finding of an unfair labor practice as well as the Labor Board’s certification of the union as exclusive bargaining representative. (See Matter of Wallach’s, Inc. v. Boland, 277 N. Y. 345, supra; Labor *34 Bd. v. Metropolitan Ins. Co., 380 U. S. 438, 439.) Instead, it invoked the provisions of section 716 (subd. 4) for the resolution of the controversy. The Industrial Commissioner appointed a three-man fact-finding commission and, when its recommendations were rejected by the hospital, the Commissioner sent the controversy to compulsory arbitration before the New York State Board of Mediation. The hospital brought the present actions in which it is essentially seeking to enjoin the fact-finding commission from functioning and to stay the compulsory arbitration proceeding.
As already indicated, we are called upon to decide whether an issue as to representation is a “dispute” under section 716 (subd. 1). If it is not, then, the Industrial Commissioner lacked the authority to appoint the fact-finding commission and to send the issue to compulsory arbitration. The legislative history, the language of the amendments and underlying policy considerations lead us to conclude that representation issues are not embraced in the word “ dispute ” as defined by that section.
The reason for excluding representation issues from that definition is manifest: the same legislative body, which had declared in section 716 that economic issues were to be resolved by mediation, fact-finding and binding arbitration, also amended section 715 to provide that representation issues in the case of nonprofitmaking hospitals would be determined—as they had been in the case of industrial and commercial establishments (§ 705)—by the Labor Board. Since, therefore, representation disputes were to be resolved by the Labor Board, there was neither occasion nor reason for the Legislature to create different procedures and a second tribunal to resolve the same issue, especially since questions as to representation, including any issue as to the appropriate bargaining unit, call particularly for the expert judgment of the Labor Board. As we wrote in Matter of Levinsohn Corp. (Joint Bd. of Cloak, Suit, Skirt & Reefer Makers’ Union) (299 N. Y. 454, 466), in speaking of the powers of the National Labor Relations Board to deal with representation issues — and this applies with equal force to the -State Labor Board — “ The Federal courts have ■uniformly recognized that because of the complexity and difficulty of the problem of designating the appropriate unit, the power to make the decision has been delegated exclusively *35 to the expert judgment of the board which has wide discretion in making the determination.”
The words, ‘ ‘ concerning the association or representation of persons ”, are contained in the definition of “ labor dispute ” as set forth in section 701 (subd. 8), a section which has been in effect for many years prior to 1963 and which, although inapplicable to the present cases, does furnish the background for viewing the definition of “ dispute ” in section 716 (subd. 1). If the design of the Legislature had been to make section 716 applicable to representation issues, it would have been a simple matter to have included those section 701 words in the definition contained in section 716 (subd. I).[1]
That those words were intentionally omitted from section 716 (subd. 1) is also apparent from the fact that the Legislature rejected the Savarese bill—the forerunner to section 716—which called for mediation and compulsory arbitration of ‘ ‘ labor disputes ’ ’ between nonprofitmaking hospitals and representatives of their employees but defined “ labor disputes ” as including controversies “ concerning the association or representation of persons.” (Joint Committee Report, N. Y. Legis. Doc., 1963, No. 38, pp. 76-78.)
The traditional method of obtaining a court review of a board certification by challenging the board’s unfair labor practice order (see ante, p. 32), still applies to industrial and commercial enterprises (Labor Law, § 707), and there is nothing in reason, or in the language of sections 715[2] and 716 which even remotely suggests that nonprofitmaking hospitals to which section 707 now applies do not have the same right of judicial *36 review[3] of a board certification that employers generally possess under that section (§ 707) or that a different procedure of judicial review was intended to apply to nonprofitmaking hospitals. A decision that the validity of the board’s certification cannot be tested in the court until time-consuming mediation, fact-finding and compulsory arbitration proceedings have been exhausted can only serve to delay a prompt determination of the representation issue — a delay which is not in the interest of the public, the nonprofitmaking hospitals or the unions, since unresolved representation issués may cause the very strife which the 1963 amendments were enacted to prevent.
There have been occasions when the Legislature has granted two administrative agencies concurrent jurisdiction to determine the same issue but the wisdom of such a grant of power is highly questionable, involving as it may duplicative proceedings and delays in decision making. We should not, therefore, be astute to find the existence of concurrent jurisdiction unless no other reading of the statute is possible. Here, as we have shown, there is nothing in the statutory scheme to support a claim of concurrent jurisdiction. On the contrary, there is no overlapping between the jurisdiction of the Labor Board and the Industrial Commissioner; the Labor Board is given exclusive jurisdiction with respect to questions of representation and the Industrial Commissioner and State Mediation Board are granted powers confined to economic matters. Indeed, section 702 (subd. 9) specifically provides, “Notwithstanding the provisions of any other law, neither the industrial commissioner nor any board or other agency of the department of labor *37 shall in any way direct, review, modify or reverse any decision or finding of the board ”.
Concededly, section 716 may not be invoked by a group of employees or by a minority union to arbitrate disputes with a nonprofitmaking hospital. If the statute were to be so read, it would be possible, for instance, for five hospital employees — out of a total of 100 or more — to obtain mediation, fact-finding and arbitration under section 716, even though those five speak for none but themselves; and this process could be repeated so long as any other minority group made similar collective bargaining demands upon the hospital. Such a reading of the statute, which would augment the rights of minority groups, would go counter to the modern-day labor policy which, as we recently observed in Matter of Phalen v. Theatrical Protective Union No. 1 (22 N Y 2d 34, 43 [concurring opn.]), “has been built on the premise that a majority labor organization is the most effective vehicle for obtaining improvements in wages, hours and working conditions. * * * [The policy therefore] ‘ extinguishes the individual employee’s power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees.’ (NLRB v. Allis-Chalmers Mfg. Co., 388 U. S. 175, 180.) ”
We may not overlook the very significant fact that, if section 716 may be invoked by a minority union before there has been a determination as to the appropriate bargaining unit, then, the arbitration board, in order to make a meaningful award respecting the collective bargaining demands of a minority group or union, would have to determine the appropriate unit to which wages, hours, union security, seniority and other economic matters should be made applicable. An award based upon such a unit determination would give rise to serious questions of due process since it would be rendered in a bilateral arbitration proceeding without other essential and necessary parties (other employees and other unions), with a vital interest in the award, having had an opportunity to be heard. What is more, the unit determination in a section 716 arbitration proceeding would be made not by the Labor Board, which we have repeatedly come to recognize has special competence to deal with unit problems *38 (Matter of Levinsohn Corp. [Joint Bd. of Cloak, Suit, Skirt & Reefer Makers’ Union], 299 N. Y. 454, supra), but by an ad hoc arbitration panel not necessarily possessing the expertise to pass on frequently complicated and perplexing unit questions.
Furthermore, since collective bargaining includes the handling of grievances and arbitration proceedings, it would be—as the courts have held—an unfair labor practice for the employer to arbitrate with a minority union since the very process of arbitrating with a minority union is a violation of the majority union’s rights. (See, e.g., McGuire v. Humble Oil & Refining Co., 355 F. 2d 352, cert. den. 384 U. S. 988.) It defies common sense to adopt an interpretation of the statute which would thus destroy the exclusive bargaining rights of a majority union. Indeed, it would mean that the Legislature in 1963 simultaneously enacted two provisions, one of which, section 715 (see, also, § 706), made it an unfair labor practice for a nonprofitmaking hospital to arbitrate with a minority union, and the other, section 716, required the hospital by virtue of the compulsion of the statute to arbitrate with a minority union and thus commit an unfair labor practice.
To avoid the chaos which would result from such a construction of section 716, and to give majority unions the complete bundle of exclusive rights which they acquired by the statutory changes made in 1963, section 715 must be read as granting exclusive collective bargaining rights to a majority union— including the exclusive right to participate in arbitration proceedings under section 716 — and section 716 must be read as meaning that it may be invoked only by a union representing a majority of the employees in an appropriate bargaining unit. In short, a condition precedent to a union’s resorting ■to the provision of section 716 is the establishment of its exclusive representation status under sections 705 and 707.[4]
*39 Most regrettable and unfortunate is the long delay which the union claims has prevented the parties from commencing negotiations and from agreeing to the terms of a collective bargaining agreement. But, it must be said, the fault lies not with the statute, the Labor Law provision, but with the union for failing to follow the judicially accepted method for testing the validity of a board certification by filing a refusal to bargain charge under section 706. Had the union pursued traditional procedures, the delay in resolving the current issue — whether section 716 may be invoked where the employing hospital challenges the representation status of the union—would, in all likelihood, never have occurred.[5] However, and without effecting any change in the traditional methods for such review, all undue delay could be avoided by legislation requiring that certification and refusal to bargain proceedings be expedited and that the period for the prosecution of appeals from the board’s ensuing orders be shortened (cf. Judiciary Law, § 751, subd. 2, par. [d], cl. [ii]). Accordingly, we take the liberty of suggesting that the Legislature give thought to such an enactment.
For the reasons stated, the orders appealed from should be reversed and the appellant’s application (1) for a declaration that the Industrial Commissioner had no authority to make his order of June 30, 1965, appointing the fact-finding commission, and (2) for an order permanently staying the arbitration order by the Industrial Commissioner until the respondent union’s certification has been judicially reviewed and found valid and enforeible should be granted.

. Section 701 (subd. 8) in relevant part provides: “ The term ‘ labor dispute ’ includes, but is not restricted to, any controversy between employers and employees or their representatives as defined in this section concerning terms, tenure or conditions of employment or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to negotiate, fix, ■ maintain or change terms or conditions of employment ” (Emphasis supplied.)

. In 1963, this section (§ 715) extended the provisions of article 20 of the Labor Law to nonprofitmaking hospitals. One of the sections of that article thus made applicable to these hospitals was section 707 which gives aggrieved persons the right of judicial review of final board orders and, pursuant to such provision, employers generally, as previously noted (ante, p. 32), may obtain a court review of a board certification by challenging the board’s unfair labor practice order.

. It is today an established principle of jurisprudence that “ judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.” (Abbott Labs. v. Gardner, 387 U. S. 136, 140; see Matter of Jeampierre v. Arbury, 4 N Y 2d 238, 240 ; 4 Davis, Administrative Law Treatise, § 28.07, pp. 30-32.) Since, in the present case, certifications are (as we have already shown) subject to judicial review under section 707 by challenging the board’s unfair labor practice order, the presumption of reviewability of the certification clearly applies. In point of fact, in the absence of some procedure for the review of a final agency action, a serious constitutional question might arise, for, as was recently observed, “ there must be some type of effective judicial review of final, substantive agency action which seriously affects personal or property rights.” (Gardner v. Toilet Goods Assn., 387 U. S. 167, 177, per Fortas, J.)

. In this connection, it should be noted that the Appellate Division, in one of the early appeals in these very cases (Long Is. Coll. Hosp. v. Gatherwood, 26 A D 2d 543), also reached the conclusion that the term “ dispute ” in section 716 (subd. 1) does not include a representation issue, declaring that: “The disputes provision of section 716' of the Labor Law is not sufficiently broad to include a dispute over the right to exclusive representation by a union, the propriety of a bargaining unit, or any other issues raised as to the correctness of certification of an exclusive bargaining agent.”

. It is not inappropriate to note, however, that delays may occur whenever parties resort to the courts for a final adjudication of their disputes. In Labor Bd. v. Metropolitan Ins. Co. (380 U. S. 438), for instance, where the question as to the validity of- a board certification was reviewed by the courts as part of a challenge to a board’s order sustaining a refusal to bargain charge, the time which elapsed from the date of the board certification to the date of the Supreme Court’s determination as to the validity of the certification was 2% years. (See, also, Metropolitan Life Ins. Co., 156 N. L. R. B. 1408.)